__x__ FILED   ___ ENTERED
____ LOGGED   ____ RECEIVED

1:15 pm, Jun 25 2020
AT BALTIMORE
CLERK, U.S. DISTRICRT COURT
DISTRICT OF MARYLAND
BY crp_____Deputy

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (410) 330-4873 | Case No. 1:20-mj-1504 TMD |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Cara Rose, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I submit this Affidavit in support of an application for a search warrant for information associated with the cellular telephone assigned call number assigned call number **(410) 330-4873** (hereinafter the **"TARGET TELEPHONE"**), identified as belonging to Joshua Lankford, registered to Preston Lankford whose address is 4811 Steele Neck Road, Vienna, Maryland, that is stored at premises controlled by AT&T (Cricket), a wireless telephone service provider.

2. The information to be searched is described in Attachment A. Pursuant to 18 U.S.C § 2703(c)(1)(A), the warrant would require AT&T to disclose the information described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

3. As described further in this affidavit, there is probable cause to search the property described in Attachment A for the information described in Attachment B, which constitutes evidence, instrumentalities, and/or fruits of the following federal criminal offenses: 18 U.S.C. § 1591 (Sex Trafficking by Force, Fraud, or Coercion), 18 U.S.C. § 1594 (Conspiracy

1

to Commit Sex Trafficking), 18 U.S.C. § 1201(a),(c) (Kidnapping & Conspiracy to Commit Kidnapping), 18 U.S.C. § 2422 (Coercion and Enticement), 18 U.S.C. § 2421 (Transporting Individual to Engage in Prostitution), and 18 U.S.C. § 1952(a) (Interstate Travel to Promote Enterprise Involving Prostitution Offense) (collectively referred herein as the **"SUBJECT OFFENSES**.")

4. This court has authority to issue the requested warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A). The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offenses being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

5. I have been employed as a Special Agent of the U.S. Department of Homeland Security, Homeland Security Investigations ("HSI"), since 2008, and am currently assigned to the office of the Resident Agent-in-Charge ("RAC") in Ocean City, Maryland. Before that, I was assigned to HSI Detroit, Michigan, for six years. While employed by HSI, I have investigated federal criminal violations related to human trafficking, human smuggling, high technology or cybercrime, child exploitation, and child pornography. I have gained experience through training at the Federal Law Enforcement Training Center and through work relating to conducting these types of investigations. I have also received advanced training in human trafficking and have had the opportunity to observe and review numerous examples of human trafficking (as defined in 18 U.S.C. § 1591) in all forms of media, including computer media. During my employment with HSI, I have conducted investigations throughout Maryland and other states involved in said investigations. During my investigative duties, I have also had contact—in the form of interviews and meetings—with human traffickers and those involved in

1:20-mj-1504 TMD

the human trafficking and exploitation of adults and children. Additionally, I have assisted in the execution of numerous search warrants relating to investigations of offenses involving the human trafficking of persons, both for the purposes of sexual servitude and forced labor.

6. I am a federal law enforcement officer engaged in the enforcement of federal criminal laws—and Maryland state statutes—that criminalize human trafficking, and I am authorized by the Secretary of the Department of Homeland Security to request the issuance of search warrants.

7. The investigation concerns alleged violations of the **SUBJECT OFFENSES**, relating to human trafficking, coercion and enticement, and the interstate travel for the purpose of engaging in illicit sexual conduct. Based on my training and experience, I am familiar with the means and methods used by human traffickers. I am familiar with the support and assistance that human trafficking organizations require to conduct their illegal activities. I have also become knowledgeable about the criminal statutes of the United States, particularly in the area of the law relating to violations of the federal human trafficking and conspiracy statutes.

8. As set forth below, there is probable cause to believe that a search of the cell site data/records of the target phone listed above may uncover the evidence, fruits, and/or instrumentalities of violations of the aforementioned federal offenses.

9. I have participated in this investigation personally and have witnessed many of the facts and circumstances described herein. I also have received information from other federal and local law enforcement and intelligence officials relating to this investigation. The information set forth in this Affidavit is based on my own observations and review of documents, or reliable information provided to me by other law enforcement personnel. Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I am setting forth only

3

those facts and circumstances necessary to establish probable cause for the issuance of the requested search warrant. However, I have not omitted any fact which might tend to defeat a finding of probable cause. Unless otherwise indicated, all written and oral statements referred to herein are set forth in substance and in part, rather than verbatim.

## PROBABLE CAUSE

10. Joshua Lankford ("Lankford"), Lakeya Aldridge ("Aldridge"), David Goodwin ("Goodwin"), and Kevonne Murphy ("Murphy") were originally charged in Delaware state court with human trafficking and related offenses, and on August 1, 2019, a Grand Jury in the District of Maryland returned a four-count Indictment against Lankford, Aldridge, and Murphy, charging each of them with Conspiracy to Commit Sex Trafficking in violation of Title 18 U.S.C. § 1594(c); Sex Trafficking, in violation of 18 U.S.C. § 1591(a), (b)(1); Conspiracy to Commit Kidnapping; and substantive Kidnapping, in violation of 18 U.S.C. § 1201(a) and (c) (Criminal Case Number: CCB-19-0371). Goodwin was charged with Conspiracy to Commit Sex Trafficking via a Criminal Information in a separate case (Criminal Case Number: CCB-19-0320). A Superseding Indictment was later returned, adding offenses related to the interstate transportation of Victim K.A. between Maryland and Delaware, based on the conduct described *infra*.

11. On October 30, 2018, HSI received information from Delaware State Police (DSP) that at approximately 0830 hours, Troop 5 Patrol Units were dispatched to the Relax Inn room #20 located at 30702 Sussex Hwy in Laurel, DE for a welfare check. A female called 911 stating she was being held hostage in room #20 at the Relax Inn. The female did not provide her name or the suspects' names but stated she had been assaulted.

12. DSP arrived at the hotel and initiated contact at Room #20 of the Relax Inn. A male identified as Kevonne Murphy answered the door and engaged in communication with DSP troopers. In view of DSP was a female, later identified as K.A., herein referred to as "VIC-1". VIC-1 walked behind Murphy's left shoulder, stood up on her toes, made eye contact with DSP, and appeared to be mouthing words with no vocal sound. It appeared to DSP troopers that VIC-1 was the complainant and troopers began to make contact with everyone inside the hotel room.

13. VIC-1 was wearing only a white bed sheet when she exited the hotel room and was placed into a patrol vehicle. VIC-1 had visible bruising to her neck and jaw area. VIC-1 stated to DSP that she was assaulted by Murphy and a female, Lakeya Aldridge, because she did not make enough money while prostituting. VIC-1 stated she had been going out and performing sexual acts for money but had to give all the money to Murphy and Aldridge. DSP detectives were dispatched to the scene for further investigation.

14. VIC-1 was transported to Nanticoke Memorial Hospital to be examined for her injuries. Aldridge's vehicle (2008 Kia Sportage displaying DE Temp Reg XP628277) was towed from the scene to DSP Troop 4 in Georgetown, DE for further examination. A search warrant was obtained for Room #20 of the Relax Inn and was executed by DSP. DSP located a ledger with sexual acts handwritten on it in the hotel room trash can.

15. During an interview at Nanticoke Memorial Hospital with DSP and HSI, VIC-1 provided the following information. She was prostituting on her own in Federalsburg, MD before meeting Joshua Lankford ("Lankford"). VIC-1 stated Lankford promised her more money and a larger client network if she began working for him. VIC-1 agreed to work for Lankford and would give all the money she made from the prostitution to Lankford. VIC-1

advised after working for Lankford for a couple days, Aldridge took over and VIC-1 began giving the proceeds from the prostitution to Aldridge.

16. VIC-1 informed DSP and HSI that Aldridge drove her, Murphy, Lankford, and another male who was present inside the hotel room when DSP troopers responded (David Goodwin), to Laurel, Delaware on October 26, 2018, and checked into the Relax Inn room # 20. VIC-1 stated she was then driven to the Sunrise Motel room # 44 in Seaford, Delaware on October 27, 2018 where she stayed for one day before being driven back to the Relax Inn room #20 on Sunday, October 28, 2018.  VIC-1 told investigators that clients came to the rooms at both the Relax Inn and the Sunrise Motel where she would perform sexual acts for money. VIC-1 then had to give the money she made from the sexual acts to either Aldridge, Lankford, or Murphy. VIC-1 advised she arranged some of the clients through Facebook using Aldridge's phone, Murphy's phone, and Lankford's phone (the **TARGET TELEPHONE**) because she did not have a cell phone of her own.  VIC-1 stated she used Murphy's cellular telephone, so she could contact Aldridge after she had been with a "John" (known to law enforcement as terminology for someone that solicits sex for money) and ready to be picked up.

17. VIC-1 told investigators that on October 29, 2018, Aldridge was upset with VIC-1 because they thought she hadn't made enough money while with a client in the Greensboro, MD area.  As a result, VIC-1 was driven to a location in Federalsburg, Maryland near the railroad tracks where Aldridge, Lankford, Murphy, and Goodwin physically assaulted her.  She was struck several times in the face and neck area.  VIC-1 was then ordered to the ground where her pants were pulled down and Aldridge struck her several times on the buttocks with Aldridge's belt.  VIC-1 stated the belt was then placed around her neck to restrain her and prevent her from attempting to exit the vehicle as they drove back to the Relax Inn located in Laurel, Delaware.

VIC-1 stated that Lankford held the belt while in the vehicle and once they arrived at the hotel the belt was removed, and she was told to act normal.

18.  Once inside the hotel room, VIC-1 was told she could not leave and that she had to take a shower. When VIC-1 exited the shower, she was not permitted to put on any clothes and was forced to lay on the floor naked all night. VIC-1 stated she was required to raise her hand if she wanted to use the bathroom.

19.  VIC-1 was promised drugs and money, along with help getting her son back, in exchange for working for Lankford, Aldridge, and Murphy. Lankford never severed ties with her but brought Aldridge and Murphy into the arrangement.

20.  VIC-1 stated Lankford's phone, the **TARGET TELEPHONE**, was listed in a contact of Murphy's phone as "Light Bright." VIC-1 also stated that Aldridge's phone listed Lankford as a contact under the name "Yellow" and listed Murphy's phone as "Humble."

21.  On October 30, 2018, Aldridge was interviewed and admitted to assaulting VIC-1 in Maryland, specifically, striking her with a belt. Aldridge admitted to providing transportation for VIC-1 to meet her prostitution clients/johns; Aldridge also admitted to receiving the money VIC-1 earned from each client. Aldridge advised Lankford recruited her to handle VIC-1 and wanted Aldridge to get VIC-1 to work. Aldridge stated Lankford told her what prices to have VIC-1 charge for each client. Aldridge stated Goodwin wrote the sex acts ledger/list, but that Lankford told him what to write. Aldridge advised VIC-1 used Aldridge's phone to communicate with clients and even stated she read some of the messages. When Aldridge was taken into custody she was in possession of a black Samsung Cellular telephone Model SM-S327VL(GP), IMEI: 355744091245112 assigned cellular telephone number (302) 362-2143.

22.     On October 30, 2018, Murphy was interviewed and admitted he knew VIC-1 was prostituting herself and working for Aldridge. Murphy stated he would let VIC-1 use his cellular telephone to communicate with her family. Murphy advised there would most likely be communications in his cellular telephone referencing clients/johns. Murphy stated he saw messages from clients/johns asking to see VIC-1 again including one message that had a picture of money with a caption saying she "was missing out". Murphy said there was also a message on his phone that was supposedly sent to VIC-1 referencing how much money a certain client/john was going to pay her. Murphy advised he was promised a new iPhone from Aldridge for letting VIC-1 use his cellular telephone.

23.     Additionally, Murphy stated that the morning after the assault he and Aldridge left the Relax Inn to pick someone up from work and drive them home. Murphy advised he left his cellular telephone with Goodwin, so they could check and make sure Goodwin and VIC-1 were ok while he and Aldridge were gone. Murphy stated he was communicating with Goodwin via text message while they were gone and advised Goodwin sent him a text message saying VIC-1 was sleeping. When Murphy was taken into custody, he was in possession of a black LG cellular telephone, S/N 808VTTD0771057 assigned phone number (443) 258-3294. Murphy confirmed that this was his phone.

24.     On October 31, 2018, members of the Delaware State Fugitive Task Force and the Capital Area Regional Fugitive Task Force arrested Lankford at 3448 Holland Drive in Federalsburg, Maryland.

25.     On November 26, 2018, Delaware Judge John Hudson of the Sussex County Justice of the Peace Court issued search warrants for cell phones recovered in the case, including the phones belonging to Aldridge, Murphy, and Goodwin.[1]

26.     An analysis of the of Murphy's Black LG Cell Phone S/N 808VTTD0771057 shows SMS messages between Murphy's and Aldridge's cell phones on the morning of October 30, 2018. Statements made by Murphy and Aldridge during their recorded interviews indicated they left VIC-1 at the Relax Inn with David Goodwin and with Murphy's black LG cell phone, while they went to pick up the father of Aldridge's child.  The messages are as follows:

MURPHY: "You good bruh" (0328 hours)

GOODWIN: "yea im good og I got her locked down" (0328 hours)

MURPHY: "Ite just checking" (0329 hours)

GOODWIN: "Yea big homie we good I'm just chilling on my. Toes" (0341 hours)

MURPHY: "Yo you straight" (0416 hours)

GOODWIN: "Yea Gucci big homie were yall at ?? (0418 hours)

GOODWIN: "She laying down" (0418 hours)

MURPHY: "We waiting on her bd to get off then heading back to yal" (0419 hours)

MURPHY: "Otw" (0517 hours)

---

[1] The Delaware State warrant included authorization to search the **TARGET TELEPHONE**, which is in the lawful possession of law enforcement.  Subsequent federal warrants issued for a search of the **TARGET TELEPHONE** and for historical cell site data related to the phone. Any and all information learned from the seizure of the **TARGET TELEPHONE** itself and from Lankford himself has been intentionally excised from this search warrant Affidavit.  The probable cause within this Affidavit rests solely on information learned entirely independent of any seizure and possession of the **TARGET TELEPHONE,** and independent of any statements of Lankford. However, as stated, I have not omitted any fact which might tend to defeat a finding of probable cause.

Case 1:20-mj-01504-TMD   Document 3   Filed 06/25/20   Page 10 of 18

1:20-mj-1504 TMD

27.     Additionally, texts messages in Murphy's cellular telephone show contact between Murphy's phone and Lankford's cellular telephone (the **TARGET TELEPHONE**) regarding VIC-1 detailed below:

- On 10/24/18 at 1:49 p.m. (UTC), a message was sent to the **TARGET TELEPHONE** from Murphy's phone, stating, "Yo tell bunny they said that's not good enough" This message indicates Lankford was physically with VIC-1 on 10/24/18.

- On 10/25/18 at 2:35 p.m. (UTC), a message was sent to the **TARGET TELEPHONE** from Murphy's phone, stating, "Bruh shawty passingout and shit wats up with her bruh I ain't tryna catch no body over her being stupid deal with her she scaring other money away"

- On 10/26/18 at 7:50 p.m. (UTC), a message was sent to the **TARGET TELEPHONE** from Murphy's phone, stating, "Where are you guys cal me asap" Approximately 24 seconds later a phone call was received from Lankford's phone.

- On 10/26/18 at 7:59 p.m. (UTC), a message was received on Murphy's cell phone from the **TARGET TELEPHONE** stating, "Are you oka". At around 8:27 p.m. (UTC), Murphy responded, NO." Multiple phones calls were made to Lankford following this message.

- On 10/27/18 at 1:04 a.m. (UTC), a message was sent from Murphy's cell phone to the **TARGET TELEPHONE**, stating, "That's a no go bruh she pissed imma try calm her down"

- On 10/27/18 at 1:13 a.m. (UTC), a message was sent to the **TARGET TELEPHONE** from Murphy's cell phone, stating, "Bunny got her id but she said she done fam and ahe said she not coming bruh she got tears and all that but imma keep trying". About one minute later, the **TARGET TELEPHONE** sent Murphy's phone a message, stating, "This is not the time to quit just let her know that I said that and tell her that I'm not upset for her actions because something positive happen".

28.     The last referenced message occurred two days prior to VIC-1 being assaulted which prompted her calling 911 for help. This message indicates Lankford's involvement in the business. Additionally, Murphy's phone contained multiple photographs of VIC-1. In some of the images VIC-1 was fully clothed while other images show VIC-1 was dressed only in a bra

and underwear.  The cellular phone extraction report showed that these images were sent to an intended client on October 29, 2018.

29.     Based on my training and experience, the above listed SMS text exchanges are consistent with a human trafficker that is contacting the "security" that is tasked with watching over the victim while the head trafficker or controller is not physically present. I believe that Aldridge's phone, which was in possession of Murphy and Aldridge, was sending messages to Murphy's phone (in possession of Goodwin) to make sure Goodwin had VIC-1 controlled and there were no problems.

30.     A Delaware State subpoena request was issued for the toll records associated with the cellular telephones seized in this investigation. Toll record analysis showed numerous daily communications in the form of text messages and telephone calls between 410-330-4873 (the **TARGET TLEPHONE**), 302-362-2143 (Aldridge), and 443-258-3294 (Murphy) from October 25, 2018 through October 30, 2018.  Investigators also found evidence that Lankford and Murphy had communicated via their cell phones after the police had arrived at the hotel and encountered all of the subjects inside.   There was an incoming call to Murphy's phone from the **TARGET TELEPHONE**. This is consistent with statements made by VIC-1 to investigators on 10/30/18 that Murphy had been in contact with Lankford after the police had arrived to the hotel elicited by her call to 911.

31.     A review of toll records from AT&T (Cricket) also revealed that the subscriber of the **TARGET TELEPHONE** is Preston Lankford, a purported relative of Joshua Lankford's. Open source information shows that Joshua Lankford and Preston Lankford both reported 3448 Holland Drive, Federalsburg, MD, as their residence during the timeframe April 2016 through

October 2016.  As noted earlier in this affidavit, Lankford was also arrested in connection with this case at this residence.

32. I believe the cell cite data/records from the cellular telephone identified in this Affidavit will supply the investigators with relevant information pertaining to physical locations and communications surrounding the timeframe VIC-1 was being trafficked and physically assaulted leading up to the date they were arrested pursuant to this investigation.

## BACKGROUND ON CELL SITE DATA

33. In my training and experience, I have learned that AT&T is a company that provides cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records.  E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

12

Case 1:20-mj-01504-TMD   Document 3   Filed 06/25/20   Page 13 of 18

1:20-mj-1504 TMD

34.     Based on my training and experience, I know that AT&T can collect cell-site data about the **TARGET TELEPHONE**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as AT&T typically collects and retains cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

35.     Based on my training and experience, I know that AT&T also collects per-call measurement data, which AT&T also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based on the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

36.     Based on my training and experience, I know that wireless providers such as AT&T typically collects and retains information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as AT&T typically collects and retains information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and

experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the users and locations of the **TARGET TELEPHONE**.

## AUTHORIZATION REQUEST

37. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

38. I further request that the Court direct AT&T to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. I also request that the Court direct AT&T to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively. Because the warrant will be served on AT&T, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

39. The proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrants authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

Respectfully submitted,

*Cara Rose*

Cara Rose
Special Agent
Homeland Security Investigations

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this ___9___ day of June, 2020.

_____
Hon. Thomas M. DiGirolamo
UNITED STATES MAGISTRATE JUDGE

1:20-mj-1504 TMD

# ATTACHMENT A

## Property to Be Searched

This warrant applies to records and information associated with the cellular telephone assigned call number **(410) 330-4873 (**the **TARGET TELEPHONE),** with listed subscriber(s), whose wireless service provider is AT&T ("the Provider"), a company headquartered at 11760 U.S. Highway 1, Suite 300 North Palm Beach, FL 33408.

## ATTACHMENT B

### Particular Things to be Seized

**I. Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A from October 15, 2018 until November 1, 2018:

a. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

   i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses). This is to include any other pertinent call detail records including special features codes, or any other codes that are maintained in the normal course of business for AT&T cellular numbers identified in the course of the investigation;

   ii. cell site information, to include all known cell towers associated with outgoing and incoming calls (Call Detail Records). This information is to include any sector information, if known, cell site location, and any other related material that would be necessary to identify the location and sector in reference to the cell site information associated with the call detail records. In the event text messages, MMS messages, LTE and Data activity including IP session and destination addresses that were produced are also available with cell site information, this information would be included in this request;

   iii. cell site locations for all AT&T Cell Sites, sector information, including Azimuth headings, in the regional market associated with the requested cell site information;

    iv. location information, to include any estimated or known longitude and latitude of the cellular device's current location, or approximate location, information received by cell tower(s) in reference to direction and distance from the tower a device may be located (timing and triangulation information). Radio Frequency signal strengths, direction, and transmission information. The geographical constraints of location information will be limited to the United States; and

    v. location information can be in the form of historical records. Specific to AT&T, this would include any reports of device activity that would include the approximate latitude and longitude of the device at the time of the activity, direction and distance from the tower, and other location related information commonly referred to as an RTT, EVDO, ALULTE, and Levdort report. This further includes any other report similar in nature.

## II. Information to be Seized by the Government

All information described in Section I that constitutes evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1591 (Sex Trafficking by Force, Fraud, or Coercion), 18 U.S.C. § 1594 (Conspiracy to Commit Sex Trafficking), 18 U.S.C. § 1201(a),(c) (Kidnapping & Conspiracy to Commit Kidnapping), 18 U.S.C. § 2422 (Coercion and Enticement), 18 U.S.C. § 2421 (Transporting Individual to Engage in Prostitution), and/or 18 U.S.C. § 1952(a) (Interstate Travel to Promote Enterprise Involving Prostitution Offense) involving the **TARGET TELEPHONE** between October 15, 2018 and November 1, 2018.

To the extent that the location information includes tangible property, wire or electronic communications (as defined in 18 U.S.C. § 2510), or stored wire or electronic information, there is reasonable necessity for the seizure, and AT&T shall provide such information. *See* 18 U.S.C. § 3103a(b)(2).